(No. 22056.—

EDWIN S. REYNOLDS, Plaintiff in Error, *vs.* FRITZ PETERSON *et al.* Defendants in Error.

*Opinion filed April 21, 1934.*

JOHN B. KING, for plaintiff in error.

WARD, WARD & SCHEINEMAN, and HARRY H. WAITE, for defendants in error.

Per CURIAM: A bill was filed in the circuit court of Whiteside county by Edwin S. Reynolds, through his conservator, Warren E. Reynolds, against Fritz Peterson and Anna K. Peterson, his wife, to set aside a deed to a farm known as Willowlawn. It is alleged that complainant, soon after arriving at legal age, in 1921, became the owner of Willowlawn, consisting of 320 acres, the South farm, containing 320 acres, the Creek farm, containing about 420 acres, and also certain residence property in Prophetstown; that he was inexperienced in business and prior to his becoming the owner of said property had never owned any real estate and had no means of his own; that he was, and still is, a person of unsound mind and incapable of having charge of his property and affairs, all of which was well known to defendants; that they planned to take advantage of his feeble mental condition and thereafter persuaded and induced him to convey to them the Willowlawn farm for certain lands owned and controlled by them; that in response to such design they procured him to execute and deliver to them a deed to the Willowlawn farm, subject to an encumbrance thereon of $25,000; that on the same day they executed and delivered to him and to his sister, Helena B. Reynolds, a deed to a tract of land in exchange for the Willowlawn farm; that the fair cash market value of the Willowlawn farm on the date of conveyance was $80,000, subject, however, to the mortgage lien of $25,000 above mentioned; that the fair cash market value of the lands conveyed by defendants in exchange for the Willowlawn farm was $35,000; that the consideration for the transfer of the Willowlawn farm was so grossly inadequate as to amount to fraud, and that by reason of the premises complainant ought not to be required to return to defendants any of the property conveyed to him. The cause was referred to a master after issue joined, who found that complainant had failed to prove the allegations of the bill, that defendants were not guilty of the fraud

charged, and that complainant was guilty of *laches* in bringing his suit. The chancellor approved the report of the master and dismissed the bill for want of equity. The cause is brought to this court by writ of error.

Fifty witnesses were sworn and examined. We will not detail the testimony of each of them. Summarized, the evidence shows that all of the property of which complainant, Edwin S. Reynolds, was originally seized was owned by his grandfather, Edwin Reynolds, Sr., who died in 1910 leaving a last will and testament, by which he devised the property to his widow, Harriet E. Reynolds, during her life with remainder to his grandchildren, Edwin S. and Helena Reynolds, children of Warren E. Reynolds, the testator's son. Warren E. Reynolds and his wife, Amelia, were estranged. He moved to Chicago and was again married. The children lived with their mother and grandmother on the Willowlawn farm. The testimony shows that when a baby the complainant seemed normal. In boyhood he was somewhat undersize but was about the same as other boys in appearance. His clothes were neat and good. His voice was rather high-pitched and he gave some evidence of nervousness and excitability. Those who knew him in childhood and adolescence testified he appeared to be normal and of average mentality. He attended district school, high school and college. The evidence does not show whether his grades were satisfactory or not. He was a student at the University of Illinois when his grandmother died, in 1921. Almost immediately thereafter he went home, where he and his sister took charge of their farms and business. The conflict in the evidence relating to mental capacity arises out of the events which took place after he acquired possession of the real estate devised to him. His sister's mental condition is not questioned. Whether she was younger or older than he does not clearly appear, but it is shown that she was a school teacher while he was still a student. When he and

Helena took possession of the property in 1921 it was un-
encumbered and was occupied by various tenants under
leases from the grandmother. Soon thereafter complain-.
ant moved to the Coon Creek farm and resided there until
1925. During the period between 1921 and 1925 he en-
gaged in a number of trades and exchanges of property,
and in the greater number of them he was joined by his
sister. His transactions were not successful and resulted
in his insolvency. His father was appointed conservator
for him May 9, 1930.

The witnesses who testified that complainant lacked
mental capacity included a number of his relatives. His
witnesses generally, whether related to him or not, based
their opinions on the fact that his trades and deals had
been unprofitable. A few of them testified to some per-
sonal eccentricities. The witnesses who testified for de-
fendants included two bankers, a contractor, a physician, a
deputy sheriff, a stock buyer, the district superintendent
of a utility company, a justice of the peace, a district man-
ager of the Northwestern Mutual Life Insurance Company,
and a number of other business men, none of whom had
any interest in the outcome of the suit.

The deed of conveyance here attacked followed a ser-
ies of transactions between complainant and his sister on
the one part, and defendants, Fritz Peterson and Anna K.
Peterson, on the other. In 1921, and prior thereto, the
Petersons were the owners of a farm of 160 acres south-
east of Prophetstown. It was occupied by a tenant. In
1920, when the price of land was high, they entered into
a contract with Floyd E. Breed and William F. Urban
by which the latter agreed to buy the farm for $45,000.
On the execution of the contract $5000 was paid, and $5000
more was paid March 1, 1921. The remaining $35,000
was due on or before March 1, 1931, with privilege of
paying $1000, or any multiple thereof, on the first day of
March of any previous year. When $15,000 or more had

been paid it was agreed that the Petersons would deliver a deed to the purchasers, who were to secure the remainder due by first mortgage on the land, due ten years from that date, with interest at the rate of six per cent per annum. Some time after the payment of $10,000 on the purchase price under the said agreement, complainant and his sister bought from Breed and Urban their right under the contract to purchase the Peterson farm. What was the consideration for the assignment of the contract is not shown, but on October 8, 1923, an agreement in writing was entered into between complainant and Helena Reynolds as parties of the first part, and Fritz Peterson and Anna K. Peterson as parties of the second part. The agreement provided that the parties of the first part will convey to the parties of the second part the Willowlawn farm, subject to a mortgage indebtedness of $25,000 to the Northwestern Mutual Life Insurance Company. The second parties assumed and agreed to pay the indebtedness and all interest thereon subsequent to March 1, 1924. The agreement recited that the parties of the second part had theretofore executed the above mentioned contract to Breed and Urban for the conveyance of the Peterson farm; that Breed and Urban had assigned said contract to Reynolds and his sister; that if the two last mentioned parties shall carry out the terms of said contract and also procure from Breed, Urban and their respective wives a quit-claim deed to the Peterson farm, then the parties of the second part will convey said farm to the parties of the first part. The agreement further provided that all of said deeds should be executed within thirty days from the date thereof and placed in the Farmers National Bank in Prophetstown, Illinois, in escrow, to be delivered to the respective parties when they become entitled thereto. The deeds were executed and filed for record December 11, 1923.

The evidence as to the value of the Willowlawn farm ranged from $150 to $300 an acre, and it is contended by

counsel for complainant that it was a better and more valuable farm than the Peterson farm. Complainant claims that at the time of the conveyances the Willowlawn farm was worth from $225 to $250 per acre while the Peterson farm was worth $150 to $175 per acre; that if the Willowlawn farm was worth $225 an acre its total value was $72,000, but, being subject to a mortgage of $25,000, there was a remaining equity of $47,000; that the value of the Peterson farm was $25,000, hence there was a difference in the exchange values of the two tracts of $22,000, and that the consideration for the exchange was so grossly inadequate as to amount to a fraud upon complainant. In determining whether or not the basis of exchange between the parties was reasonably fair, it must be remembered that Peterson was not actually a seller of land at the time he and his wife entered into the agreement with complainant and Helena Reynolds. He had already entered into a binding contract of sale to Breed and Urban. Under that contract there was due Peterson $35,000, plus $1750 interest, or a total of $36,750. The record shows that at least one of the obligors under that contract was financially responsible. There is nothing to indicate that the obligation was not worth its face. As a part of the consideration to be paid for the Willowlawn farm Peterson discharged and released the makers of that contract as well as complainant and his sister. Peterson also assumed and agreed to pay a mortgage indebtedness of $25,000. Thus the farm cost him $61,750, or $193 an acre. In addition to that sum he agreed to pay, and did pay, the drainage assessments and general taxes on the Willowlawn farm for 1923. When all these facts are taken into consideration we are convinced that complainant received a fair price for his land. At any rate, the consideration was not so inadequate as to constitute fraud. *Chadwick* v. *Clapp,* 69 Ill. 119.

Helena Reynolds was apparently an intelligent woman, interested in business affairs. She coöperated with her

brother in joint dealings. She was not a party to the suit, and it does not appear that she is at all dissatisfied with the Peterson transaction. The fact that their ventures were not successful is of itself no ground for setting aside a conveyance. It is a matter of common knowledge that property of all kinds, particularly real estate, underwent heavy declines in value for a number of years following 1920 and 1921. Losses by real estate owners and dealers constituted the general rule. Complainant was young and very active. He not only bought and sold real estate but became interested in a garage and in a trucking business. He dealt in livestock and other property connected with the pursuit of agriculture. In the light of the history of the past few years it was not prudent to actively engage in making property exchanges during those years. While it may have been a display of bad business judgment to have done so, it was by no means a manifestation of a weak mental condition. The record does not show that complainant was mentally incapable of transacting his business affairs. Neither does it show he was over-reached by the defendants, nor that he did not understand the nature of the business in which he was engaged and the effect of what he was doing, nor that he was lacking in ability to exercise his will with reference to such business. He had the counsel of his sister, and it appears that the transaction was conducted with deliberation and understanding. Under such circumstances the act of complainant must be held valid. *Argo* v. *Coffin,* 142 Ill. 368; *Sears* v. *Vaughan,* 230 id. 572; *Kelly* v. *Nusbaum,* 244 id. 158.

In view of our conclusions it is unnecessary for us to decide the issue of *laches.*

The decree of the chancellor was correct and is accordingly affirmed.

*Decree affirmed.*